6 A.D.2d 316 (1958)
In the Matter of The Board of Education of Union Free School District No. 3 of the Town of Oyster Bay, Nassau County, et al., Respondents-Appellants,
v.
James E. Allen, Jr., as Commissioner of Education of The State of New York, Appellant-Respondent
Appellate Division of the Supreme Court of the State of New York, Third Department.
July 31, 1958.
Charles A. Brind, Jr., George B. Farrington, John P. Jehu and Elizabeth M. Eastman for appellant-respondent.
Henry Root Stern, Jr., and George C. Pratt for respondents-appellants.
Newton Millham for Board of Education of Union Free School District No. 4, Town of Oyster Bay, Nassau County, amicus curiæ.
GIBSON, HERLIHY and REYNOLDS, JJ., concur.
*317 BERGAN, J. P.
Petitioners, who comprise both the board of education and also certain taxpayers, of a union school district seek to annul an order of the State Commissioner of Education laying out a new central school district. The district in which petitioners have an interest would be embraced in the new central district. The court at Special Term has in part sustained and in part annulled the order of the commissioner. There are cross appeals.
The central school district laid down by the order of the commissioner is in the town of Oyster Bay, Nassau County. It would bring in three existing union free districts, which for convenience *318 will be called Brookville (District 3); Locust Valley (District 4); and Bayville (District 6). It is not in dispute that the main aim in setting up the proposed central district by the commissioner's order is to provide facilities for secondary education.
The record makes it clear that public sentiment is in favor of the establishment of the central district in Locust Valley and Bayville; but in the Brookville district represented by petitioners, public sentiment is very strongly against its establishment. The voting ratios in Locust Valley and Bayville are such, however, that it is manifest that upon submission of the order setting up the central district for approval, Brookville will be swept into the new district against its manifest preference.
The reasons which underlie the opposition of Brookville to the centralized school process are readily demonstrable. Brookville is a school district of relatively large wealth per capita; it has spent and committed itself to pay bond issues to provide unusually good primary education for its children at considerably greater cost per pupil than the expenditures made by the other districts; and nearly all of its children will go from this excellent primary school, not to any public high school, but to private secondary schools.
The Brookville district feels, therefore, that it has no substantial need for high school facilities for its own pupils; and that being included with its two neighboring districts, which concededly need high school facilities, will merely increase unduly its tax burden without substantial benefit to itself or the needs of its children. For these reasons, among others, petitioners contend that the order of the commissioner including Brookville within the central district is arbitrary and unreasonable.
It is argued, additionally, that the commissioner did not follow the statute in determining that the order creating the central district should be made; and the individual petitioners allege that in any event the statute is unconstitutional and the commissioner's order purported to be in pursuance of the statute in its tax impact on them is in violation of their individual rights.
We address ourselves first to the constitutional problem as it is posed by petitioners in its broadest reach: that any legislative or administrative scheme which permits a tax district to be cast in with another and larger district against its will and under circumstances where, in the pooled fiscal apparatus of the larger district, it will surely lose the autonomy and right of fiscal decision it has heretofore exercised, is a deprivation of the right *319 of self-determination by the public tax district and does violence to the constitutional rights of its taxpayers.
Indeed, it is argued by the individual petitioners that in the increased tax burden imposed by this scheme they are deprived of due process of law. The literal argument advanced in petitioners' brief is that the order of the commissioner "discriminates against them in that their tax burden will be increased to pay for the education of children of the other two districts without corresponding benefit to them, and in that the statutory procedure virtually deprives them of any right of self-determination with respect to their educational system". A statute, it is argued, which "thus penalizes a district" deprives the district taxpayers of due process of law.
The theory of taxation is that it supports the public welfare, as that may from time to time and from place to place, be conceived to be. It is usually assumed that the tax levy meets minimal constitutional safeguards against discrimination if the people who pay the tax are treated alike, and the same approximate standard of extraction is followed based, for example, on the amount of income a man receives, or the value of real property he owns in the tax district.
These standards of extraction may not be exactly just or perfectly fair, but they must be put up with. That one man may in the general interest get more benefits from public tax money than another, has never been regarded as a good reason why the other should not pay his share of the tax. The general services of the State are not bought, item by item, merely by those who use them. Public services are thought to be generally important enough to be provided by the whole community for those who need them.
People without children pay for schools; men and women who go through life without litigation must support the courts; people help pay for roads they never use and never see; families in sound mental health help sustain the hospitals for the mentally ill; residents of Kings help acquire and preserve the remote forest lands of Hamilton.
It is one of the concomitant local inequities of the modern State that well-off geographical sections are likely to spend more than they ever hope to get back in carrying along the general burden; and that economically strong areas help sustain the weak ones. This is true within the Federal Union; within the State of New York; within cities, within counties; and within central school districts.
But a local inequity is not necessarily a general injustice and while the individual petitioners make out an appealing case *320 of carrying more than they think warranted of the burden, placed alongside the benefits, of the new district, they do not make out a case of constitutional discrimination for which a law court is able to afford redress.
Besides these broad constitutional arguments penetrating into the area of political economy, the individual taxpayers pursue a more conventional form of constitutional attack upon the statute under which the commissioner acted in making his order laying out the proposed district. It is contended that section 1801 of the Education Law is unconstitutional in the sense "it fails to specify standards adequate to guide the Commissioner in laying out central school districts" and is therefore invalid.
The only specifically prescribed statutory duty of the commissioner in laying out a central district is that he "shall include only territory of suitable size conveniently located for the attendance of pupils and having a sufficient number of pupils for the establishment of a central school." (Education Law, § 1801, subd. 2.) One aspect of the constitutionality of this statute, that it was an invalid delegation of legislative power, was answered in a taxpayer's challenge in Gardner v. Ginther (232 App. Div. 296, affd. 257 N.Y. 578) by holding the power to be administrative and not legislative; a view reiterated in Matter of Bd. of Educ. of Union Free School Dist. No. 1, Towns of Bethlehem, Coeymans & New Scotland v. Wilson (303 N.Y. 107, 114-115).
In truly "administrative" acts, if the administrator follows the form of the statute which lays down his powers, "standards" are irrelevant and not a subject of interest or concern to the court. How many policemen are assigned to a street intersection; whether a street is to be cleaned Monday or Friday; whether a road is to be constructed here rather than there, whether traffic is to be routed one way and not another, are not matters that need prescriptive "standards" found in a law to be properly confided to a public agency; they are matters that need judgment and may be granted to the administrator in broad terms.
The "standards" that the courts hold are to "guide" the administrator, aside from legislative delegation, are standards that he must look to when he undertakes to act in something like the role of the judge, in the "quasi-judicial" area, to decide private rights. In such cases "standards" become valuable guides to the judge on review; and the need for standards is coextensive with the willingness of the court to examine and annul what the administrator has done with the rights of the individual.
*321 It is, perhaps, useful in gaining a perspective of the problem presented by the petitioners to examine illustrations of the boundaries of administrative function and power that have been laid down judicially; and distinctions which have been drawn by the court between different categories of administrative power.
It is a common thing for the court to look at the statutory authority and also at what the administrator has done to see whether he has kept within the frame of his powers.
Good illustrations of this process are to be found in Matter of Cherry v. Board of Regents (289 N.Y. 148) where the Regents were found to have exceeded the literal statutory grant of power to discipline a dentist; in Bus Depot Holding Corp. v. Valentine (288 N.Y. 115) where the police commissioner was found to have exceeded the grant of power in excluding interstate busses from the streets; and Matter of Small v. Moss (279 N.Y. 288) where refusal to issue a theatre license because of increased traffic hazard was held beyond the legal frame of power of the licensing officer.
These cases illustrate, not the inadequacy of "standards" of delegation; but the failure to delegate enough, and they are essentially cases based on a plain absence of administrative power as the court read the statute. When one turns to quasi-judicial power exercised by an administrator, one sees other needs. Since the administrator acts also as a judge, he must have, as a judge must have, evidence, i.e. "substantial evidence" to sustain him. (Matter of Kopec v. Buffalo Brake Beam-Acme Steel & Malleable Iron Works, 304 N.Y. 65.)
On still another aspect of administrative law, when the court thinks that there is undue delegation of "legislative power" it will not sanction the administrator's attempt to exercise it (Matter of Seignious v. Rice, 273 N.Y. 44). An extreme form of restriction on this ground is to be observed in Matter of Lyons v. Prince (281 N.Y. 557) where a commissioner of buildings was held not to have acted within the frame of his legal power to require certain construction to conform with safety in addition to the words appearing in the statute. A good illustration of what may be regarded as not arbitrary when the administrator keeps within the statutory frame is Matter of Marburg v. Cole (286 N.Y. 202).
To the extent the question of "standards" may be thought to have been left open after Ginther and in Wilson we are of opinion that the statute is not invalid for a failure of prescription of more detailed standards for the guidance of the administrative action of the commissioner than those in his broad grant of power in matters of education.
Whether the commissioner followed the frame of the statutory power given him by the Legislature is quite a different *322 matter; and is not to be confused with the legal concept of invalidity of the statute because of a failure of the Legislature to set up standards in giving that power. The statute here, as it has been noticed, does set up the conditions under which the commissioner may make an order laying out a central district. He must meet those terms to make a valid order; and at this point the petitioner union school district as a public corporation to which such an issue of law is also available, joins the individual taxpayers in their attack on the order.
If the terms of the statute have not been followed the power of the court to annul is undoubted and is conceded by the commissioner. The central district, so runs the statute, shall include "only territory of suitable size conveniently located for the attendance of pupils and having a sufficient number of pupils for" the establishment of such a district. (Education Law, § 1801, subd. 2.)
The attack on the commissioner's order for failure to follow his statutory authority lies in two branches: (a) that in deciding to lay down the central district he could consider only the conditions written out in the statute and no other conditions; and (b) that the statutory conditions have not been met in the proposed central district.
The first argument is one carried over from quasi-administrative determinations where an administrator decides individual rights within the frame of a statute prescribing those rights. One of the two authorities relied on is Matter of Barry v. O'Connell (303 N.Y. 46), a liquor license case; the other is Matter of Picone v. Commissioner of Licenses (241 N.Y. 157), where a junk boat license was denied on two stated grounds neither of which was authorized by statute.
These authorities have no relevancy to the decision of the Commissioner of Education to lay down a central school district. Section 1801 provides the minimum conditions of what a district shall contain as to geographical size and number of pupils. To say that is all there is to it, is grossly to underestimate the responsibility and duty of the commissioner. He could, and certainly should in the conscientious exercise of his function, take into consideration a wide range of questions of sound administration and good educational policy and practice, standing well above the minimal statutory requirements of size and number.
It seems reasonably clear that the conditions of geographical size and minimum number of pupils are legislative minimal prescriptions without the existence of which the commissioner would not lay out a central school district; but assuming these *323 bare conditions of size and number to exist, the commissioner clearly has the duty of considering nevertheless whether it is wise and desirable to make the order for the district and of examining all the complicated and relevant data which may bear on such a decision. To say, as petitioner seems to say, that he is to close his eyes to all beyond convenient size and number of pupils is to do violence to the statute and the commissioner's powers.
On the second branch of the argument based on a failure of statutory compliance, it is contended that the central district as laid out is not "of suitable size conveniently located". The burden of this argument is that since the central school must be placed in one of the three present districts it will be relatively (depending on where it is located) inconvenient for pupils from the other two to get there.
Essentially this is an argument against the policy of establishing central school districts: "the larger the geographical central school district, the greater the inconvenience of attendance to pupils". This is something inherent in the idea of a central district and the statutory words "conveniently located" (Education Law, § 1801, subd. 2) necessarily are to be read to mean convenience within the scope of the central school concept by keeping in mind that no central school would possibly be quite as convenient as having complete secondary school facilities in each existing district.
It is further argued that convenience is not promoted by including Brookville in the district; but this seems to us to be a question of sound administrative judgment and a question which the commissioner surely is more competent to decide than the court. We are not able to hold, surely, that his determination is arbitrary in this respect. The additional argument that Brookville, in or out, would not have much effect on the requirement for "a sufficient number of pupils" falls in the same class. The studies accompanying the commissioner's answer, some of which are attached also as exhibits to the petition, indicate that the order setting up the central district looks to the needs of the future, and even at present ratios Brookville ought to share in the pupil increase projected into 1960-1961.
The answer interposed by the commissioner in our view is a sufficient pleading. Although petitioners argue that there is no allegation that the commissioner considered the detailed statistical and fiscal studies and projections attached to the answer in making his determination, his pleadings with respect of the most detailed of them is that they were "studies made *324 by the respondent", which means he made them, or as head of the department, had them made for his use, which amounts to the same thing. We are of opinion that the determination of the court at Special Term dismissing this portion of the petition as now consolidated was correct.
Before it becomes effective, an order of the commissioner laying out a central school district must be followed by certain organizational procedures; and the Special Term has annulled a notice of election and an election in the district held in pursuance of the notice because the court found that one of the essential procedures had not been followed in accordance with the statute.
This procedural failure was in the sufficiency of the petition asking for the organization of the new district as provided by section 1802 (subd. 1, par. a) of the statute. Since decision turns on how the statutory language is to be read, it will be useful to quote the pertinent text:
"1802. 1. New central school districts shall be organized as provided in this subdivision.
a. When an order laying out a central school district has been made and entered as provided in section eighteen hundred one of this chapter, a petition may be presented by persons qualified to vote at school district meetings asking for the organization of a central school district and the establishment of a central school therein. Said petition shall be signed by at least one hundred of such qualified voters or by a number of such qualified voters equal to at least ten per centum of the pupils of said central school district as determined by the last school census, whichever shall be less. If such territory includes one or more cities of less than ten thousand inhabitants or villages having a population of one thousand or more, then such petition shall be signed by at least one hundred of such qualified voters residing within each said city or village, or by a number of such qualified voters residing within each said city or village equal to at least ten per centum of the pupils of the school district residing within said city or village as determined by the last school census, whichever shall be less; and shall also be signed by at least one hundred of such qualified voters residing in said district outside of any city or village or by a number of qualified voters residing in said district outside of any city or village equal to at least ten per centum of the pupils of the school district residing outside of any city or village, as determined by the last school census, whichever shall be less."
*325 The district as laid down by the commissioner which here follows the line of the present Brookville district, embraces a portion of the Village of Brookville and a portion of the Village of Old Brookville. About one third of the former and one tenth of the latter are within the present Brookville district and thus would be within the new central district. There is a dispute about the population, but for the purpose of this proceeding we assume that each of the two villages has a population in excess of 1,000.
If the only test set up in the statute were that fixed by the word "includes" no one would have much difficulty in reading the language to mean an intent to require the special number of signatures only when the proposed district embraced an entire village. That is the plain meaning of the words "includes one or more * * * villages having a population of one thousand or more", read in context with the phrase "such qualified voters residing within each said * * * village".
Not any of these words could fairly be construed to mean a portion of a village; they relate to a village in entity. A statute which demands a prescribed inclusion of an entity is not satisfied by an inclusion of something less than the entity prescribed.
The words on which petitioners mainly rely to carry a construction to require the special number of village signatures even though the district does not include the entire village are these: "then such petition shall be signed by at least one hundred of such qualified voters residing within each said * * * village, or by a number of such qualified voters residing within each said * * * village equal to at least ten per centum of the pupils of the school district residing within said * * * village".
It is argued that ten per cent of the pupils "of the school district" who are "residing within said * * * village" would not have been used by the Legislature unless it had intended to have the test met in villages that might only partly be included in the district. It is said that if the Legislature had meant that the special number of village signatures are to be required only if the entire village is included in the district, it would have provided, merely, ten per cent of the pupils residing in the village, and would have found it unnecessary to say "of the school district".
From this it is argued that the Legislature intended to require the special number of village signatures where there is any part of the district within the village, i.e., where any number of pupils "of the school district" reside in the village.
*326 The answer to this argument does not depend merely on the ordinary meaning that is to be attached to the word "includes" as embracing the village in entity; it is to be gathered from other contextual expressions, and to be inferred from the general use of the formula in other parts of the statute.
In the first place it is clear that the "persons qualified to vote" who are entitled to sign this petition are residents of the existing school districts to be embraced in the central district, and no others. The first sentence of paragraph a of subdivision 1 defines the persons who may sign the petition as those "qualified to vote at school district meetings".
But if the petitioners' reading of the language be followed, any resident of the village qualified to vote in a school district meeting could sign the petition whether he was a resident of the district involved or not; because while the language runs "ten per centum of the pupils of the school district residing within said * * * village" the voters who are counted on this basis of this percentage are not voters "of the school district", but voters "residing within * * * said * * * village". Therefore, if this construction be adopted, the number of pupils in the village and also in the district is counted for computing the number of voters needed to sign the petition, but those voters need not be voters of the district as well as of the village, but merely voters of the village.
To take this literally as a consequence of petitioners' argument is to say that when part of a village comes within the proposed district all qualified voters of the village, in or out of the district, are qualified to sign the petition. This is quite manifestly what the Legislature did not intend to allow, and hence the construction that a whole and not fragmentary part of a village was intended, which would in any event be made from the word "includes", seems to be given new strength when the alternative suggested by the petitioners' argument is examined carefully.
It will be noticed that the number of voters to be counted on the basis of ten per cent of pupils is not a special formula related to villages. It is an alternative formula which runs through this subdivision, and, indeed, through the section itself, and it has therefore no particular significance in determining whether a whole village or a part was intended by legislative contemplation to come within the word "includes". See, for example, the ten per cent of the pupils "of said central school district" and ten per cent of the pupils "residing outside" any "village" in context in the same subdivision, which seems, *327 additionally, to give further force to an intention to treat the territory within (i.e. not "residing outside") a village in the sense of entity.
Other similar language based on a percentage of pupils relating to voters appears, for example, as part of the alternative formula in paragraph b of subdivision 2 of the section. Besides all this, the basic provision for signatures in paragraph a of subdivision 1, before the alternative based on percentage is set forth, that is, at least one hundred "of such qualified voters residing within" the village, helps make clear the legislative intent to require the specially designated village voter signatures only when the whole village is to be within the central district.
The order of the Special Term should be modified to vacate that part thereof which annuls and sets aside the petition for the election and the election and to deny the petitioners' application in these respects; and as thus modified the order should be affirmed, without costs.
Order of the Special Term modified to vacate that part thereof which annuls and sets aside the petition for the election and the election and to deny the petitioners' application in these respects; and as thus modified the order is affirmed, without costs.